DEBORAH PARISI, Petitioner

v.

JOSEPH PARISI, III, Respondent

JOHN H. THOMAS, Petitioner for Registration of Foreign Judgment

High Court of American Samoa
Trial Division

FJ No. 4-88

March 13, 1989

Before REES, Associate Justice, and VAIVAO, Associate Judge.

Counsel: For Respondent, Charles Ala`ilima
         Petitioner John H. Thomas pro se

## I. Facts and Procedural History

This action arose from the filing of a copy of a foreign judgment with the Clerk of the High Court. The Uniform Enforcement of Foreign Judgments Act, A.S.C.A. §§ 43.1701 et seq., provides that a foreign judgment filed with the clerk shall be treated "in the same manner as a judgment of the High Court of American Samoa." A.S.C.A. §§ 43.1703.

Unlike any other foreign judgment filed with the High Court during the twenty-three years since enactment of the Uniform Act, this judgment was filed in the name of someone other than the party in whose name judgment had been rendered. The judgment was accompanied by a letter from John H. Thomas, a La Jolla, California, attorney who wrote on his office letterhead that "I own the accompanying Judgment to be registered with the High Court, and I will be appearing in the case in propria personam." Mr. Thomas also enclosed an "acknowledgment of assignment of judgment" to him from Deborah Parisi, in whose name judgment had been rendered.

It was not clear either to the Clerk or to the Court that a foreign judgment can be registered on any terms other than those on which it was rendered. The substitution of a person other than

107

the named plaintiff would appear to be an important change. Indeed, any interest Mr. Thomas might have would appear to have arisen not from the judgment itself but from the assignment --- a private contract whose validity has never been tested in any court and which, unlike a judgment, is not entitled to full faith and credit. The Court's immediate reaction, without benefit of briefing or argument by any party, was that the summary process provided in the Uniform Act was probably not available to enforce an assignment. This would not, of course, preclude Mr. Thomas from bringing a civil action to enforce his interest. See A.S.C.A. § 43.1708.

The situation was further complicated by the fact that the judgment in question is a judgment of divorce. It is hard to see how Mr. Thomas can truly "own" Mrs. Parisi's divorce judgment. The one sense in which such a property right could have any meaning was as an assignment of Mrs. Parisi's court-ordered support payments, and an attempted assignment of alimentary rights raises serious questions whether the rights arose from a local or a foreign judgment. Spousal support is awarded for reasons of public policy and is not freely alienable by private contract. See In re Marriage of Higgason, 516 P.2d 289 (Cal. 1973); In re Marriage of Winegard, 278 N.W.2d 505 (Iowa 1979); In re Fisher, 153 N.E.2d 832 (Ill. 1958).

Finally, the fact that Mr. Thomas is an attorney not licensed to practice in American Samoa --- and the fact that before the date of the "acknowledgment of assignment" he had written the Clerk on his law office letterhead saying that he planned to register a foreign judgment and had been sent a copy of the High Court rules regarding appearances pro hac vice by outside attorneys--- suggested the possibility that the assignment was a sham transaction designed to evade these rules. The alternative possibility, that Mr. Thomas was a genuine purchaser for value, raised the possibility that in enforcing the proffered assignment the Court might be lending its authority to a contingent fee in a domestic relations case or to some other prohibited business transaction between attorney and client.

The Court was not certain, of course, that any impropriety had occurred. There might have been (and still might be) some reasonable explanation

for the peculiarities appearing on the face of the documents that were filed with the Court. If Mr. Thomas had been present in American Samoa or represented by local counsel, the Court would have set the matter for a hearing in order to learn the facts giving rise to the assignment. Instead, after devoting some thought and some study to whether such an assignment could be determined to be enforceable or unenforceable without reference to its underlying circumstances, the Court issued an order directing Mr. Thomas to supply it with certain information. This included the consideration, if any, given by Mr. Thomas; whether Mr. Thomas had represented Mrs. Parisi in the divorce or performed other legal services for her; the connection, if any, between the assignment and such representation; and whether Mrs. Parisi had consulted or been advised to consult separate counsel before entering into the assignment.

Mr. Thomas responded by way of a letter to the judge who had issued the order. In his letter he chided the Court for taking several months to decide what to do about his request; noted that he did not "understand the purpose of [the Court's] questions"; corrected an error in the Court's opinion; and answered all but one of the questions that had been directed to him. He said that he had represented Mrs. Parisi in the divorce action and had secured the assignment as a means of collecting the judgment for her. He did not advise her to seek separate counsel, presumably because the assignment was an incident of his representation rather than a distinct attorney-client business transaction.

Mr. Thomas's response to the Court's question regarding consideration for the assignment was as follows: "I paid no money to Mrs. Parisi for the assignment; I did promise my client to use my best efforts to collect the judgment." This implies, although it does not state, that Mr. Thomas had agreed to pass on to Mrs. Parisi all the money he should collect. Assuming this to be the case (or even on the somewhat likelier assumption that Mr. Thomas intends to deduct a reasonable hourly rate for legal services from any amounts recovered) the Court is satisfied that the assignment does not constitute a prohibited attorney-client business transaction.

This does not, however, resolve the other two questions presented by this action: (1) whether, according to the provisions of the Uniform Act, a contract for the assignment of a foreign judgment is entitled to registration and execution on the same terms as the judgment itself; and (2) whether the attorney for a foreign judgment creditor may take such an assignment and appear pro se, thereby avoiding the rule that attorneys who represent clients before the High Court must first apply and be admitted to practice in American Samoa.

## II. Appearance Pro Se by an Assignee for Collection

Our answer to the question of pro se appearances by assignees makes it unnecessary to decide the broader question whether an assignee of a foreign judgment can ever register and enforce the judgment in his own name.

Mr. Thomas enclosed with his letter to the Court a copy of an excerpt from a practice aid and form book for California collection lawyers. The excerpt provides authority for the proposition that, while "[c]ivil actions must be prosecuted in the name of the real party in interest," in California an assignee for collection "is a real party in interest and may recover, even though the assignor retains an interest in the claim."

The High Court of American Samoa has, however, taken a different view of the status of assignees for collection. This is partly due to the context in which the question has arisen.

The High Court has been faced on a number of occasions over the years with individuals who, although ineligible for admission to the Bar, have set up the functional equivalent of law offices and proceeded to take on clients. Representing themselves variously as free-lance negotiators, private investigators, social workers, collection agencies, "spokesperson[s]," "certified court interpreter[s]," "Citizens' Law Committee[s]," or simply "Samoan High Chief[s]," such persons have undertaken to perform services well within the traditional definition of the practice of law.

The Court has little control over such activities so long as they take place out of court. Frequently, however, our unofficial attorneys have

attempted to make court appearances. After being told by the Court that only licensed attorneys can represent other people, the unlicensed advocate generally makes at least one further effort in the guise of a plaintiff or co-plaintiff appearing in his own right. The <u>pro forma</u> assignment of an interest in the subject matter giving rise to the litigation, although by no means the only device by which ersatz lawyers have been recast as simulated plaintiffs, is something of a favorite. <u>See</u>, <u>e.g.</u>, <u>Tapuvae v. Lutali</u>, CA No. 88-86; <u>Lam Yuen v. Leomiti</u>, LT 3-87; <u>Pago Pago Collection Agency v. Groves Gas Station</u>, CA 32-88.

The Court's unwillingness to accept such devices at face value derives not from enthusiasm for the concept of a lawyers' guild, but from experience with the unhappy results of amateur barristry. These have included not only artless pleadings and pointless arguments, but also the forfeiture of important substantive and procedural rights through the missing of jurisdictional deadlines or the fatal misconstruction of rules and statutes. Nor is the "client" of the plaintiff-for-hire the only person whose rights may be prejudiced. Certain rights of the opposing party, such as the right to proceed against the plaintiff by way of counterclaim and to require timely and truthful answers to interrogatories and requests for admission, become meaningless if the nominal plaintiff has no personal knowledge of the events on which his claim is based.

At least some of these concerns are presumably absent when the nominal plaintiff has been licensed as a lawyer in another jurisdiction. Even so, the Court and the Territory have legitimate interests in ensuring that every lawyer who represents a client here has first been admitted to practice. A lawyer who wishes to appear only in a single case may apply for admission <u>pro hac vice</u>. Such admission is routinely granted so long as the applicant is an attorney in good standing in another jurisdiction, has never been suspended or disbarred, and has no disciplinary complaints pending against him. The lawyer is required to associate an American Samoa lawyer upon whom process may be served and with whom the Court and the local parties may communicate concerning the case. Admission <u>pro hac vice</u> also submits the attorney to the rules of professional

responsibility with which local attorneys are required to comply. See High Court Rule 145.

In the context of a case such as the present one involving many thousands of dollars, the difficulty and expense of admission pro hac vice are negligible. If Mr. Thomas had sought such admission, presenting himself from the outset as Mrs. Parisi's attorney, this proceeding would have been a relatively simple one. By presenting himself instead as a pro se litigant and the "owner" of the Parisi divorce he confronted the Court with a far more difficult case. By making an appearance in the High Court in the course of providing legal services to a client without applying for admission pro hac vice, Mr. Thomas also engaged in the unauthorized practice of law.[1]

---

[1] See A.S.C.A. § 31.0104; High Court Rule 145. Our opinion on this question does not depend on whether an assignee for collection has standing to sue in his own name. Although most American jurisdictions recognize such standing either by statute or by judicial decision, the courts of these jurisdictions routinely look behind the fiction of "legal ownership" when an assignee for collection attempts to appear in Court pro se or otherwise to circumvent the rules concerning the unauthorized practice of law.

> The taking of an assignment [by the defendants, a collection agency] . . . cannot possibly change the essential fact that the defendants are rendering legal services for another for gain. The constitutional provision designed to insure the right of a party to appear in his own behalf neither authorizes nor protects the practice of the defendants of rendering legal services to others by adopting the form of an assignment.

Nelson v. Smith, 154 P.2d 634, 640 (Utah 1944). See also, e.g., J. H. Marshall & Associates v. Burleson, 313 A.2d 587 (D.C. 1973); People v. Securities Discount Corp., 198 N.E. 681 (Ill. 1935); Bump v. Barnett, 16 N.W.2d 579 (Iowa 1944); Bay County Bar

Moreover, in order to portray himself as the real party in interest Mr. Thomas apparently found it necessary to engage in an even more serious misrepresentation. In his submission to the High Court Mr. Thomas included an exemplified copy of the May 1986 Parisi divorce judgment, providing in pertinent part that Joseph Parisi is ordered to pay petitioner Deborah Parisi spousal support in the amount of $5,000 per month for two and one-half years, a total of $150,000. It was this judgment, as modified by the assignment to himself, that Mr. Thomas asked the High Court to register and enforce. What he did not tell the Court was that on May 2, 1988, pursuant to a stipulation between Mr. and Mrs. Parisi, the California court had issued a new order substantially modifying the 1986 judgment. Under the new order the total amount of spousal support was $66,774.08 --- less than half the amount of the judgment Mr. Thomas sought to register in the High Court.

After counsel for respondent Joseph Parisi had brought the May 1988 order to our attention, Mr. Thomas responded that he would never have attempted to collect more than was actually owed. This is beside the point. The spousal support provision of the May 1986 judgment, the only part of the judgment that could have been "assigned" to Mr. Parisi, had been supplanted and rendered legally unenforceable by the May 1988 judgment. Unless (as seems most unlikely) Mr. Thomas was somehow unaware of the later judgment, he was asking the High Court to register a judgment whose only enforceable provision he knew to be null and void. If he wished to collect only the amount of the new judgment, the proper course was to register the new judgment. To request registration of the old judgment without informing the Court that it had been modified and substantially annulled appears to have been a deliberate misrepresentation.

---

Association v. Finance System, Inc., 76 N.W.2d 23 (Mich. 1956); State v. C.S. Dudley & Co., 102 S.W.2d 895 (Mo.), cert. den., 302 U.S. 693 (1937); State ex rel. State Bar of Wisconsin v. Bonded Collections, Inc., 154 N.W.2d 250 (Wis. 1967).

### III. Respondent's Nonpayment of Spousal Support

If there is anything at all to be said for Mr. Thomas's conduct in connection with this case, it is that it may not have been as bad as Mr. Parisi's conduct. In testimony before the Court, Mr. Parisi cheerfully admitted that he had made no spousal support payments. He said his non-payment was on the advice of his California attorney, "because we're still fighting it." Yet he does not deny Mr. Thomas's assertion that he did not file the supersedeas bond required to stay the effectiveness of the judgment pending appeal.

Mr. Parisi also attempted to mislead the Court about his income --- initially giving evasive answers designed to make petitioner's estimate of $250,000 per year look unrealistic, then admitting when confronted with evidence of his earnings that he made "about $200,000" in 1988.

Finally, Mr. Parisi testified that he had remarried shortly after the divorce became final in 1986. Since he seemed to hesitate before giving his answer, the Court rephrased the question and Mr. Parisi answered again that he had remarried in 1986, just after the divorce. The Court's records reflect, however, that Mr. Parisi contracted a second marriage on September 18, 1985, about nine months before the effective date of his divorce from the first Mrs. Parisi.

### IV. Conclusion and Order

Although Mr. Thomas is not entitled to collect anything from Mr. Parisi on his own account, it would appear that Mrs. Parisi is so entitled.

The record reflects that about $50,000 has been collected on a California garnishment of Mr. Parisi's wages. Mr. Parisi testified that the garnishment is ongoing and that it will result in payment of the modified support order no later than April 30, 1989.

We therefore order a stay of further proceedings in this action until April 30, 1989. If at that time there are amounts still owing on the modified support order, or if Mrs. Parisi can show that there are other amounts owing, she may

114

move for an amendment of this action to reflect (1) her status as the judgment creditor and (2) the modification of the 1986 judgment by the 1988 order and any subsequent orders. She may then proceed to enforce the judgment. If she proceeds through Mr. Thomas or another attorney, that attorney shall comply with High Court Rule 145.

In any case, Mr. Thomas is directed to answer forthwith the question directed to him on December 12, 1988, with regard to consideration for the assignment. Specifically, the Court wishes to be sure that it was correct to infer from Mr. Thomas's letter that he had agreed to turn over to Mrs. Parisi the entire sum recovered. If Mr. Thomas agreed to turn over less than all of the money recovered, then he should inform the Court (as he should have done in response to the original inquiry) of the terms of any such agreement. If the agreement or any part of it is in writing, he should provide a copy to the Court.

It is so ordered.